V 88B

December 21, 2003

The Honorable Sandra Beckwith
U.S. District Court Judge
Potter Stewart Building
Cincinnati, Oh 45202

RECEIVED
DEC 2 3 2003

Dear Judge Beckwith, CR-1-02-168-1

Please find enclosed the statement of facts as they actually happened. I have sent a copy to Mrs. Brinkman as I did not want her to think that there was something underhanded occuring.

I have offered the AUSA any proof she desires to verify my facts.

I thank you for your consideration and I hope you understand that I could not, under oath, allow the inaccuracies to be a part of the record, at least not unchallenged.

Sincerely,
Paul LaLonde

Pursuant to the accepted plea agreement the following is the defendant's debriefed and verifiable Statement of Facts.

STATEMENT OF FACTS

1. On or about 1995 R.J. Heath reccommended the defendant to Mr. Weber as someone who might be able to aid their son who was convicted of murder. At the time, I did work for the National Foundation for Legal Assistance. Defendant told Mr. Weber when he called that for a $5,000 fee he would: 1) See if habeas relief was possible 2) If Mr. Weber's son could be moved to a better prison facility. Defendant met Mr. + Mrs. Weber at lunch in Indianapolis. At the lunch a Private Investigator was suggested by Mr. Weber. The P.I. had nothing to do with the original agreement. Defendant travelled to the prison where Mr. Weber's son was incarcerated. After a lengthy visit and many hours of work afterward (including calls to Mr. Weber) Mr. Weber's son was moved to a better situation. After the interview and a careful review of all of the evidence against his son defendant advised Mr. Weber that additional services would not be productive.

2. During 1995 and 1996 defendant borrowed funds from Edwina Knott for the purposes of increasing their value at a higher rate than commercially available. Defendant used Mrs. Knott's money for two businesses 1) Parties on Wheels 2) National Credit Enhancement. Defendant readily admits that he made these investments sound riskless. However, Mrs. Knott was aware that defendant's family was involved in these businesses. All expense items were left up to the discretion of the defendant. Among these expenses was a trip to Sedona, Az to examine + meet a CD source for NCE. These expenses were paid by NCE. Mrs. Knott made a very profitable return on her money from the fee generated from National Credit Enhancement

3. In July 1996 defendant asked Mr. Hicks to write a check for $65,000 based on a copy of a wire that defendant had received. Mr. Hicks had been paying the bills for the household where defendants two sons, Mr. Hicks and defendant resided. The wire did not come. It caused an overdraft at Bank One in defendant's account. This overdraft was turned over to the Bank's security department. Ms JoAnn Burkhardt, of Bank One security just happened to have an application to the FBI pending. She called the FBI and this investigation began from there. She turned over all of my bank records. The overdraft was paid in 1998. No civil suit was ever filed by Bank One.

4. On or about November 15, 1997, Mr Mark Kletterer, a mandated agent for Magellin Entertainment, Inc. flew from New York to Greater Cincinnati airport to meet defendant. Mr. Kletterer sought defendant's help. Mr. Kletterer stated that Magellin had a loan commitment from the Imperial Bank of Los Angeles, California. In order to complete this loan, Magellin needed for NCE (National Credit Enhancement) to purchase Certificates of Deposit from the Imperial Bank consistent with the program designed by Mr David Miller. There were two problems that had to be overcome: First, Magellin was requiring that the account where they were to send the money be insured.* Secondly, the transaction had to be started and completed during the first week of January 1998. On January 4, 1998 Berman (AKA Tony Romano) and Shane of Magellin called the defendant and informed him that the Imperial Bank could not grant a loan to Magellin under any circumstances, and could we please change the agreement and allow them to make other arrangements.



* David Miller procurred insurance for the account

Defendant could have gone ahead, brought the CD's from Imperial Bank and earned the fees. It would have been totally within the agreement and Mark Kletterer, agent for Magellin, strongly advised to do just that. Instead defendant allowed Magellin to make other arrangements within the confines of the agreement. Thomas McGhee barely knew who Magellin was at this juncture nor was his firm involved in any way in the transaction. Mr. McGhee was listed as a reference (among several) to Magellen but only as someone who could speak for the capability of NCE to perform according to the contract. Magellin went from place to place unable to find a loan under the terms of the contract originally agreed upon. In July of 1998 defendant resigned any official duties as it regarded Magellin or the Credit Enhancement business. Richard Liggett of Cloverleaf agreed to purchase the business after he completed his financing arrangements with Credit Suisse. The entire Magellin structure shown in Court occured well after the fact, including the agreement that Magellin supplied to the government. It (the agreement) bears the name of the defendant, but it is not his signature.

5. Defendant gave a $15,000 check to secure a residence in Florida. The sellers, however, wanted more earnest money. Defendant issued a post-dated check for $60,000, which was returned twice for NSF. Defendant did ask Mr. Liggett to call the company (real estate) in an effort to postpone the closing. All that Mr. Liggett said was that when the Credit Suisse transaction was closed, defendant had the financial where-withall to close on the house. When Credit Suisse never closed, the $15,000 was forfeited and the purchase agreement declared null and void.

6. The defendant, with the backing of the CCA (Country Clubs of America, Inc) and their President, R.J. Heath and their Vice President Mr. Evans to send $210,000 to enhance CCA, Inc in their quest to build golf courses

a) The CD's were to be used through Cloverleaf to secure financing (through the Credit Suisse closing)

b) The money was to be deposited into an insured account. It was.

c) Defendant never said 7.5M CD's were at Continental

d) If the defendant did not perform the money was to be returned.

e) R.J. Heath, President of CCA, Inc. by faxed letter gave explicit authorization to use the $210,000 to help as we saw fit.

7. Defendant had absolutely nothing to do with the Wrights or the sending of their money. Defendant was first made aware of the Wright situation when Cloverleaf asked if he would travel to Florida and Arizona for the purposes of investigating a financing agency there. Defendant met a Mr. Brown in West Palm Beach, visited in his office and in general attempted to find out if the situation looked promising. Defendant notified Cloverleaf of his contact and arrangements were made for Mr. Liggett to travel to Florida to meet Mr. Brown. After several days of meetings defendant became convinced that Mr. Brown could not provide the necessary treasury bills to finance these various projects. Defendant stated that to Mr. Liggett, and in addition, informed Mr. McGhee of same. Mr. McGhee said "not to worry as no money would leave the Cloverleaf account until Brown's company had issued and placed the "call"* Relieved, defendant went to Arizona to make sure Cloverleaf, at least, had the CD's necessary to complete the Credit Suisse closing, fund all of the projects and buy out defendant.



* A call is a live financial instrument, a derivative instrument

Mr. McGhee called several days later saying that Mr. Liggett (the sole signing authority) had authorized sending the money to Brown under the proviso that the "call" was in route. Prior to the money leaving, both Mr. McGhee and the defendant advised Mr. Liggett not to send the $350,000. Defendant was sent $63,000 from the Cloverleaf account solely for the purpose of buying CD's from the Farmers and Merchants Bank in Ellicott City. Defendant did this. The remainder (less than $10,000) was used to reimburse defendant for his trips to Florida & Arizona on behalf of Cloverleaf. Furthermore defendant had no conversations or exchanges with the Wrights until a meeting was set up by Cloverleaf under the pretense of "we've heard of these people, let's put a face on a name." The purpose of the meeting, according to Cloverleaf was to induce the Wrights to finance the "rating" that was now needed (according to Mr. Liggett) to complete the Credit Suisse funding. All parties (defendant, Mr. Liggett, Mr. McGhee) met with the Wrights where a proposal to use a Cincinnati law firm and CPA firm was discussed. Defendant backed out because he had no handle on the Credit Suisse situation. Mr. McGhee will verify.

8. Everything stated in the Bergeron stipulation is essentially accurate. Defendant never actually spoke to Bergeron. Defendant's statements were reliant upon the Credit Suisse financing.

9. The income tax statement is even more troubling. Defendant had no income in 1996 as Mrs. Knott's money was a loan that was repaid. 1997 brought a small income. Defendant did file for an extension in Florida when he resided.

Deductions [illegible] defendant [illegible] tax on 1997. 1998 brought defendant income of $900,000 but deductions exceeded income, therefore no tax was due. 1999 Defendant had income of $200,000 with deductions of $310,000. An extension was filed in Florida for that year.

10 In 1996 defendant met Mr. Steve Lane, FBI agent, at the Federal Building. At this encounter, Bank One, Mrs. Edwina Knott, and various other things were discussed. After two hours of extensive questioning Mr. Lane said the Bank One, Edwina Knott's situation were resolved but strongly suggested they be repaid as rapidly as posible.